UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 14-50028 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **AMENDED** |
| vs. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| ARNOLD BARTON JOHNSTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

Defendant Arnold Barton Johnston is before the court on an indictment charging him with possession with intent to distribute fifty grams or more of methamphetamine.  See Docket No. 1.  Mr. Johnston now moves the court to suppress statements he made and evidence seized from him on March 8, 2014. See Docket Nos. 18, 33.  The government opposes Mr. Johnston's motion.  See Docket Nos. 20, 21, 22, 35.  The district court, the Honorable Jeffrey L. Viken, Chief Judge, referred this motion to this magistrate judge for the holding of an evidentiary hearing and the filing of a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTS

An evidentiary hearing was held in this matter on May 20, 2014. Mr. Johnston and his counsel, Assistant Federal Public Defender Erin Bollinger, were present.   The government was represented by Assistant United States

Attorney Ted McBride.   From the testimony and exhibits received at that hearing the court makes the following findings of fact.

At approximately 4:30 p.m. on March 8, 2014, dispatch for Meade County, South Dakota, received a 911 call from 22325 Elk Vale Road.   This residence was owned by Roche (pronounced "Rocky") Vickerman and had been the subject of many law enforcement calls in the past for assaults and for illegal drugs.   The 911 caller was a female who stated that her aunt was high on drugs and had assaulted the caller and was chasing the caller.   Deputy Richard Nasser of the Meade County Sheriff's Office received this call and proceeded to the Vickerman residence.   He recorded the excursion via a small camera mounted over his right ear.   A DVD of the recording made by Deputy Nasser was introduced into evidence as Exhibit 1.   South Dakota State Highway Patrol Trooper Derek Mann also received the call and proceeded to the Vickerman residence.

The Vickerman residence is described as containing many acres of property and is tiered.   The upper tier is along Elk Vale Road, then there is a second tier lower than the first, and a third tier, the lowest, on which the Vickerman residence sits.   The property is rural in nature and was described as looking like a salvage yard.   There are many abandoned trailers and vehicles scattered throughout the property.   There is also a gravel pit.   Deputy Nasser testified that the residence provides many places to hide and is difficult to secure.   Trooper Mann basically agreed with this assessment, but noted that the

many vehicles also served to provide cover for law enforcement as they approached the house.

Deputy Nasser and Trooper Mann met up with the female who had made the 911 call out on the road away from the Vickerman residence.   They left the female in the care of a third officer, Deputy Steve Johnson, and both Nasser and Mann, in separate vehicles, approached the residence itself.   It should be noted that the 911 caller was no longer in peril at this point.

On the second tier of the property, approximately fifty yards away from the Vickerman residence, the officers observed Mr. Johnston.   Mr. Johnston was standing near the passenger side of a commercial truck.   Both the driver's door and the passenger door of the truck were open.   The truck had magnets or decals on the sides of the doors of the truck identifying it as a commercial truck. There was a flatbed trailer immediately behind Mr. Johnston's truck on which was loaded a pick-up truck.   Mr. Johnston's truck was parked to the side of the road and was surrounded by dozens of other parked or abandoned pick-up trucks, campers, trailers, tires, wheels, and other trash.

Deputy Nasser testified that he made eye contact with Mr. Johnston and that Mr. Johnston then shut the passenger door on the truck and turned away from Deputy Nasser, moving toward the rear of the truck.

Mr. Johnston was familiar to Trooper Mann.   Mr. Johnston had worked for a towing company, Rapid Import Towing, in the past that was used by the Highway Patrol to tow vehicles off the highway.   Trooper Mann had made

3

contact with Mr. Johnston several times in his capacity as a tow truck driver.   In addition, Trooper Mann had, on one occasion, arrested Mr. Johnston for possession of marijuana.

Deputy Nasser exited his vehicle and walked in front of Mr. Johnston's truck.   The time on the DVD when Deputy Nasser exited his vehicle is 04:21. When Deputy Nasser came around the corner of the truck, Mr. Johnston can be seen standing near the box of the pick-up truck, facing the truck and leaning his hands against the top of the truck box.   The posture Mr. Johnston assumed is familiar to anyone who has ever seen a rancher at a livestock auction, or a farmer pausing in the midst of performing work—it is a position of repose, leaning in against a truck or the top rail on a fence.   There is even a famous photograph of Ronald Regan in a similar pose on his California ranch.



Upon exiting his vehicle, Deputy Nasser shouted, "Sir! Sheriff's Office! How ya doin'?"   Mr. Johnston replied, "good. How're you?"   Deputy Nasser replied, "good, thanks."

4

Deputy Nasser then asked, "What's your name?"   Mr. Johnston replied, "Bart Johnston."[1]   Trooper Mann can be seen in the background having exited his patrol vehicle.   Trooper Mann testified that he exited his vehicle and "flanked" Mr. Johnston's vehicle, going behind the vehicle and approaching Mr. Johnston from the opposite direction as Deputy Nasser.

Deputy Nasser then asked, "Who's livin', . . . who's down there, do you know?"   Mr. Johnston replied, "I have no idea who's down there."   This is at 4:38 on the DVD, seventeen seconds into the encounter between Mr. Johnston and Deputy Nasser.   In the DVD, in the lower left corner of the frame, Deputy Nasser's hand can be seen placed against the small of Mr. Johnston's back.

Deputy Nasser then demanded, "What're you doin'?   Do you live here?" Mr. Johnston replied, "No, I just come here to pick up this car."   He lifted his right forearm off his truck to gesture to the trailer behind his truck.   Deputy Nasser asked, "From who?"   Mr. Johnston replied, "Classic Auto." Mr. Johnston again lifted his hand to gesture as he said this.

Deputy Nasser then said, "Do you have anything on you?"   Without waiting for a response from Mr. Johnston he asked, "D'ya mind if I check real quick?"   As Deputy Nasser said this, Mr. Johnston turned his shoulders to more squarely face Deputy Nasser.   As he did so, his right hand drifted off of his truck and downward, but the DVD does not depict his hand approaching anywhere near his pockets.   Deputy Nasser reached out and grabbed Mr. Johnston's right

---

[1] Mr. Johnston's full name is Arnold Barton Johnston.

5

wrist and placed it firmly back on the side of Mr. Johnston's truck, saying, "Keep your hands here."   Trooper Mann can also be heard to say, "Keep your hands up there."   On Exhibit 1, Trooper Mann is seen standing so close to Mr. Johnston's left shoulder as to prevent any movement at all by Mr. Johnston.   Mr. Johnston is essentially pinned up against his truck by the two policemen.   The time on the DVD at this point is 4:50.

Deputy Nasser asked again, "Do you have anything on you?" Mr. Johnston replied, "no."   Deputy Nasser insisted, "Tell me right now if you do.   It'll be easier.   What do you have on you?"

At 5:08 on the DVD, Deputy Nasser can be seen with a black cell phone in his hand.   At the hearing, he testified that he reached into Mr. Johnston's pocket and removed two cell phones from Mr. Johnston's pocket because Deputy Nasser thought one of the cell phones was about to fall out of the pocket.   He also testified that when he removed the phones he knew that they were not potential weapons.

After Deputy Nasser removed Mr. Johnston's cell phones from his pocket, Trooper Mann chimed in, "Be honest about it [i.e. what you "have on you"].   You and I know each other."   Some indistinct conversation took place at this point between Trooper Mann and Mr. Johnston.   Trooper Mann can be heard to say, "Didn't I arrest you down in Hill City [South Dakota] once?"   Mr. Johnston says, "Not to my knowledge."   In this sequence, Trooper Mann can be seen standing very close to Mr. Johnston, leaning into the area of his left shoulder.

6

Trooper Mann demanded, "What're you holdin'?"   After a long pause, Mr. Johnston replies, "probably be some meth."   It is 5:20 on the DVD. Trooper Mann demands, "Where's it at?"   Mr. Johnston replied, "Coat pocket." Trooper Mann then asks, "Which side?"   Deputy Nasser then says to Trooper Mann, "I'm good here.   You wanna go stop that car?"   Deputy Nasser then demands of Mr. Johnston, "Put your hands behind your back."   It is 5:35 on the DVD, one minute and fifteen seconds after Deputy Nasser first exited his vehicle to make contact with Mr. Johnston.   Deputy Nasser then handcuffs Mr. Johnston.   Trooper Mann left the immediate vicinity of Deputy Nasser and Mr. Johnston to approach the Vickerman residence.[2]

As he is applying the handcuffs, Deputy Nasser continues to interrogate Mr. Johnston, asking the identity of the individual who the officer sees running between the Vickerman house and a vehicle parked outside.   Mr. Johnston again states he has "no idea" who the person is.   At 6:51 on the DVD, over two and a half minutes into his encounter with Mr. Johnston, Deputy Nasser asked Mr. Johnston if he had any "guns, knives, or weapons" on his person. Mr. Johnston replied, "no."

After watching events at the Vickerman residence for a few moments, Deputy Nasser asks again at 8:08 on the DVD, "Which pocket is it in?"   When

_____

[2] Deputy Nasser testified that, while the encounter between himself, Trooper Mann, and Mr. Johnston was taking place, people were seen going in between a vehicle and the Vickerman residence several times.   Then a man got into the vehicle, spun a "doughnut" in the driveway, and started to drive away from the police around the Vickerman house.   Deputy Nasser sent Trooper Mann to stop the vehicle from leaving after he handcuffed Mr. Johnston.

Mr. Johnston does not reply, Deputy Nasser states, "It'll be easier if you just be cooperative with me at this point."   Deputy Nasser continues to interrogate Mr. Johnston, asking if he has any needles on him, where his ID is, asking again how many people are in the house.   No <u>Miranda</u> advisements were given at any time prior to these questions.

Deputy Nasser testified on direct examination that Mr. Johnston appeared nervous to him when the deputy first approached because he was swallowing hard and his hands were shaking.   Deputy Nasser testified on direct that this was when he decided to do a pat search or asked Mr. Johnston if he had any weapons on him.   This testimony is belied by Exhibit 1.   Deputy Nasser never did a pat search of the outside of Mr. Johnston's clothing prior to reaching into his pocket to remove the two cell phones.   And it was long after Deputy Nasser handcuffed Mr. Johnston that he finally asked Mr. Johnston if he had any weapons on him.

The following is a recap of the time frames shown on Exhibit 1:

4:21   Deputy Nasser exits his vehicle to encounter Mr. Johnston

4:38   Deputy Nasser places his hand on Mr. Johnston's lower back as he asks "Who's down there?"

4:50   Deputy Nasser grabs Mr. Johnston's wrist as both officers command him to keep his hands on the truck

5:08   Deputy Nasser searches Mr. Johnston's pocket, removing his phones

5:20   Mr. Johnston makes his incriminating statement

5:35   Deputy Nasser handcuffs Mr. Johnston

8

6:51   Deputy Nasser asks Mr. Johnston for the first time if he has
weapons on his person

Mr. Johnston now moves to suppress his statements to Deputy Nasser and Trooper Mann on March 8, 2014, as well as the methamphetamine and other physical evidence taken from his person on that date.   The government resists.

## DISCUSSION

In support of his motion to suppress, Mr. Johnston argues that he was seized in violation of his Fourth Amendment rights and, therefore, the physical evidence and statements taken from him on March 8, 2014 after his seizure should be suppressed.   He also argues that he was in custody and, therefore, should have been advised of his Miranda rights prior to being interrogated by the officers.   Because no warnings were given, he argues that his statements should be suppressed.   The government resists these arguments.

## A.    The Law Applicable to Terry Stops

The first question presented by Mr. Johnston's motion is whether Deputy Nasser and Trooper Mann were justified in approaching Mr. Johnston initially. In Terry v. Ohio, the Supreme Court stated the basis of what was to become known as a "Terry stop":

> [W]here a police officer observes unusual conduct which leads him
> reasonably to conclude in light of his experience that criminal
> activity may be afoot and that the persons with whom he is dealing
> may be armed and presently dangerous, where in the course of
> investigating this behavior he identifies himself as a policeman and
> makes reasonable inquiries, and where nothing in the initial stages
> of the encounter serves to dispel his reasonable fear for his own or
> others' safety, he is entitled for the protection of himself and others

9

> in the area to conduct a carefully limited search of the outer clothing
> of such persons in an attempt to discover weapons which might be
> used to assault him.

Terry v. Ohio, 392 U.S. 1, 30 (1968).   The original "Terry stop" applied to a

pedestrian, but courts have expanded the analysis in Terry to apply to vehicle

stops, see Ornelas v. United States, 517 U.S. 690, 693 (1996); United States v.

Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746,

749 (8th Cir. 1999).   This body of law has also expanded to include stops based

not only on the officer's own personal observation, but also on information given

to the officer by an informer, either known or anonymous.   See Alabama v.

White, 496 U.S. 325 (1990); Adams v. Williams, 407 U.S. 143 (1972).

　　　An officer making a Terry stop "must be able to articulate something more

than an 'inchoate and unparticularized suspicion or "hunch." ' "   United States

v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 27).   The Fourth

Amendment requires "some minimal level of objective justification" for making

the stop.   INS v. Delgado, 466 U.S. 210, 217 (1984) (citations omitted).   The

Court has held that probable cause means " 'a fair probability that contraband or

evidence of a crime will be found,' and the level of suspicion required for a Terry

stop is obviously less demanding than for probable cause."   Sokolow, 490 U.S.

at 7 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)) (citing U.S. v. Montoya

de Hernandez, 473 U.S. 531, 541, 544 (1985)).   " 'Reasonable suspicion requires

"that the [officers'] suspicion be based upon particularized, objective facts which,

taken together with rational inferences from those facts, reasonably warrant

10

suspicion that a crime [has been] committed." ' "   United States v. Smith, 648

F.3d 654, 658 (8th Cir. 2011) (quoting United States v. Lopez-Mendoza, 601 F.3d

861, 865 (8th Cir. 2010) (quoting United States v. Jones, 269 F.3d 919, 927 (8th

Cir. 2001))).

> Reasonable suspicion is a less demanding standard than probable
> cause not only in the sense that reasonable suspicion can be
> established with information that is different in quantity or content
> than that required to establish probable cause, but also in the sense
> that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).   "Reasonable suspicion, like

probable cause, is dependent upon both the content of information possessed by

police and its degree of reliability.   Both factors—quantity and quality–are

considered in the 'totality of the circumstances—the whole picture,' that must be

taken into account when evaluating whether there is reasonable suspicion."

Id. (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

A police officer's knowledge that a suspect who is subjected to a Terry stop

has a past criminal history is relevant under the totality of circumstances in

determining whether the officer had a reasonable suspicion that criminal activity

was afoot.   United States v. Winters, 491 F.3d 918, 922 (8th Cir. 2007) (citing

United States v. Cornelius, 391 F.3d 965, 967 (8th Cir. 2004); United States v.

Robinson, 119 F.3d 663, 667 (8th Cir. 1997)).   Although a person has a " 'right

to ignore the police and go about his business' " and such a " 'refusal to

cooperate, without more, does not furnish the minimal level of objective

justification needed' for a Terry stop," nevertheless, the cases distinguish

11

between a person who is fleeing from the police and one who merely ignores the police.   See United States v. Gilliam, 520 F.3d 844, 847 (8th Cir. 2008) (quoting Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).

Officers conducting a Terry stop must use the "least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the" stop.   United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006) (citing United States v. Navarrette-Barron, 192 F.3d 786, 790 (8th Cir. 1999)).   In conducting a Terry stop, officers may take any reasonable measures necessary to protect their personal safety and to maintain the status quo.   Smith, 648 F.3d at 659.

If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial.   Wong Sun v. United States, 371 U.S. 471, 484 (1963); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001).   A Terry stop may morph into an arrest if the suspect is detained for an unreasonable period of time, if the officers use unreasonable force, or if the officers conduct an invasive search that exceeds the scope of a Terry stop.   United States v. Aquino, 674 F.3d 918, 924 (8th Cir. 2012);   Smith, 648 F.3d at 659.

In United States v. Jones, the district court suppressed evidence seized at a Terry stop and the Eighth Circuit affirmed.   United States v. Jones, 606 F.3d 964, 965, 968 (8th Cir. 2010) (per curiam).   In Jones, police were patrolling a high-crime area in Omaha, Nebraska but were not responding to a call for

12

assistance or a report of a crime in progress.   Id. at 965.   The officer saw Jones walking on a mild September day clutching something in the front pocket of his long-sleeved hoodie.   Id.   The temperature that day started out at fifty degrees in the morning and rose to sixty-eight degrees by late afternoon; the person did not flee or act afraid of the officers, but continually watched them as they drove by.   Id. at 966–67.   The officers articulated no basis for a reasonable belief that a crime was occurring.   Id. at 967.   The officer was unable to discern the size or shape of the object that Jones was clutching.   Id.

Under these circumstances, the court said that a person clutching something in a front pocket describes too great of an arc of lawful behavior to, by itself, constitute reasonable suspicion.   Id.   The court noted that the officer had other options than a Terry frisk, which is highly invasive, to dispel his suspicions, such as initiating a consensual encounter which might "crystallize previously unconfirmed suspicions of criminal activity."   Id. at 968.

A case in contrast to the Jones decision is United States v. Martinez, 462 F.3d 903 (8th Cir. 2006).   In that case, shortly after a bank robbery, police spotted a man, Martinez, in a park matching the description of the robber.   Id. at 906.   The officer observed that the man was walking very fast, that his face was shiny as though sweaty, and when the man noticed the police officer looking at him, he quickly looked down again.   Id.   The officer approached Martinez and asked to talk to him, whereupon Martinez—without being directed to do so—placed his hands behind his head.   Id.   The officer grabbed Martinez's

hands and told him he was being detained because he matched the description of a bank robber.   Id.   The officer then performed a pat-down search as the bank robber had used a firearm during the robbery.   Id.

A second officer asked Martinez if he had any weapons on him, and Martinez replied that he had no weapons but a large amount of cash.   Id.   The officer felt the bulge in Martinez's pocket, pulled it partially out to confirm that it was a bundle of cash, then shoved the wad of cash back into Martinez's pocket. Id.   The officer asked Martinez where he got the cash.   Id.   Martinez responded that he had just gotten paid, but when the officer scoffed at this explanation, Martinez said he retrieved it after he saw a man running through the park.   Id. Martinez was taken to the location of the bank teller, who identified Martinez as the man who had robbed her.   Id.   Martinez was then arrested.   Id.

The court held that this Terry stop was justified based on the officer's reasonable suspicion that Martinez might be the bank robber—he matched the description, we was nearby soon after the robbery, he acted suspiciously by walking quickly and seeking to avoid making eye contact with the officer.   Id. at 907.   The court also held that placing Martinez in handcuffs and transporting him back to the bank did not transform the Terry stop into an arrest under the facts presented.   Id. at 907–08.   The court concluded that handcuffing someone suspected of possessing a firearm on his person, which he had recently brandished, was a reasonable step to ensure officer safety and to preserve the status quo.   Id.   Also, the exigencies of the situation were such that the officers

14

could not dispel their reasonable suspicion as to Martinez until they had transported him back to the location of the bank teller.   Id. at 908.   The court held that Martinez was not arrested until the officers formally told him he was arrested after the teller's identification.   Id.

Mr. Johnston cites to United States v. Collins in support of his argument that the search of his person was not justified.   See United States v. Collins, 321 F.3d 691 (8th Cir. 2003).   However, the court finds the Collins decision uninstructive.   In Collins, the police were summoned with a call to dispatch stating that gun shots had been fired.   Id. at 693.   Upon arriving at the location near where the shots were reported, police found Collins slumped over in a car. Id.   A backseat passenger told the officers that Collins was merely asleep, but the officer leaned into the car to check on Collins any way.   Id.   In so doing, the officer saw a handgun sticking out of Collins' rear pants pocket.   Id.   The Eighth Circuit upheld the search of the car—the officer's leaning inside to look—on the basis of the exigent circumstances and plain view exceptions to the warrant requirement.   Id. at 694–95.   The court stated that the officers, in responding to the call reporting that shots had been fired, had an "entirely reasonable" right to approach the vehicle and investigate.   Id. at 695.   In so doing, the gun was observed in plain view.   Id.

### 1.   The **Terry** Stop Was Justified

Here, the facts are in between those of the above cases.   Like the police in Collins, the police were responding to the Vickerman residence because a report

15

of an assault had been made.   However, unlike <u>Collins</u>, the police here knew that the immediate emergency and risk of harm was over—they had met the reporting female on the road, far away from Mr. Johnston's truck, and she was safely in the protection of another officer.

Mr. Johnston argues that the <u>Terry</u> stop was not justified at all. Mr. Johnston points out that Trooper Mann knew Mr. Johnston to be someone who operated tow trucks.   Mr. Johnston was standing next to a commercial truck with a flatbed trailer with a truck loaded onto the trailer.   The officers were familiar with the Vickerman residence and, therefore, knew that Mr. Johnston did not live there.   Furthermore, the perpetrator of the assault who the officers were seeking was a female, not a male, so Mr. Johnston did not fit the profile of the person they sought to arrest.

Further, Mr. Johnston argues, he gave appropriate answers to each of the officer's questions, such as his name and why he was present.   Mr. Johnston's explanation for why he was present was not suspicious—he was known to Trooper Mann as a tow truck driver and he had with him on the scene a commercial truck together with a flatbed trailer that had a truck loaded onto the trailer.   The court agrees with all of these observations.   This is not the typical <u>Terry</u> stop situation where a suspect, by his suspicious behavior, attracts the attention of law enforcement personnel who form a reasonable suspicion that the suspect is either engaging in criminal activity or is armed with a weapon.   Had the officers not been responding to a call of violence at a residence known for

16

prior violence and drug use, the court would agree with Mr. Johnston that a

Terry stop was not justified.   See United States v. Banks, CR 13-40087-01, 2014

WL 295156 (D.S.D. Jan. 24, 2014).[3]

Mr. Johnston's non-suspicious behavior aside, however, the situation

presented to the officers that day still had the potential to be volatile.   The

residence was known to law enforcement as a location of multiple assaults and

drug related activities in the past.   Although the victim of the assault was safe,

the female perpetrator of the assault was still at large.   Furthermore, the

physical state of the Vickerman compound was such that a danger of ambush or

evasion was presented.   The court concludes that the officers were justified in

contacting Mr. Johnston to conduct a Terry stop if, for no other reason, than to

ensure that he did not have a weapon or pose a danger to the officers as they

approached the Vickerman residence with their backs turned to Mr. Johnston.

---

[3] In Banks, the court held that a pat-down search was not supported by
reasonable suspicion, see id. at 3–4, and in doing so, the court analyzed the
situation in light of the totality of the circumstances and systematically refuted
each of the officer's purported bases giving rise to a reasonable suspicion.   Id.
(The defendant's slide through a stop sign due to icy roads was not suspicious;
the defendant placing his hands in the air without being asked to do so after he
had slid through a stop sign in front of a police officer was also found not to be
suspicious; the defendant wearing a winter coat in South Dakota during the
winter months was found not to be suspicious.   The police officer also knew that
the defendant lived and worked in the town and had no reason to believe that the
defendant was violent or had a history with drug activity.   Finally, the police
officer did not notice any suspicious bulge on defendant's clothing or person
before conducting pat-down search.   Thus, although the defendant's pajamas
might have been unusual, they did not suggest that he was armed and
dangerous, especially at 1:00 a.m.—a time when pajamas are not uncommon.).

Thus, the Terry stop in this case was much more akin to the doctrine of a "protective sweep."[4]

### 2.    The Officers Exceeded the Scope of the Terry Stop

However, the court finds that the officers exceeded the scope of the Terry stop.   The whole reason for the existence of a Terry stop is to secure the safety of the officers and others—to ensure that a suspicious person is not armed and presently dangerous.   Terry v. Ohio, 392 U.S. 1, 29–30 (1968); United States v. Aquino, 674 F.3d 918, 923–24 (8th Cir. 2012); Banks, 2014 WL 295156 at *2.   A Terry stop allows for only a pat-down of the outside clothing of the suspect—the search must be limited to those actions by the officer "reasonably designed to discover concealed weapons."   Aquino, 674 F.3d at 923, 925–26 (quoting United States v. Roggeman, 279 F.3d 573, 577 (8th Cir. 2002)).

Here, Deputy Nasser actually conducted a Fourth Amendment search of Mr. Johnston's person by reaching *into* his pocket and withdrawing the cell phones.   Furthermore, Deputy Nasser did so *before* Mr. Johnston made any damaging admissions about possessing methamphetamine and *after* Deputy Nasser had assumed physical control of Mr. Johnston by placing his hand in the small of Mr. Johnston's back and by grabbing Mr. Johnston's wrist.   Deputy Nasser testified that when he went into Mr. Johnston's pocket and removed the cell phones, he knew that they were not guns or any other type of weapons. Finally, it is clear that the officers were not concerned about Mr. Johnston's

---

[4] Indeed, at the hearing, Deputy Nasser articulated "officer safety" as the primary reason he approached Mr. Johnston in the first place.

possession of weapons—it was several minutes into the encounter and only *after* Mr. Johnston had been handcuffed that Deputy Nasser first made inquiry about the presence of weapons on Mr. Johnston's person.   The officers' primary purpose in questioning Mr. Johnston was to elicit incriminating statements from him as to drug use or drug possession.

When police officers exceed the scope of a Terry stop, the stop becomes an arrest, Aquino, 674 F.3d at 924 (citing Peterson v. City of Plymouth, Minn., 945 F.2d 1416, 1419 (8th Cir. 1991)), and must be supported by probable cause.   Id. (citing United States v. Smith, 648 F.3d 654, 659 (8th Cir. 2011); United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010); United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)).   Here, at the moment that Deputy Nasser reached into Mr. Johnston's pocket to obtain the cell phones, the encounter was transformed from a Terry stop into an arrest.   Probable cause in support of an arrest of Mr. Johnston did not exist at that point.

To recap, the officers knew the following information immediately prior to Deputy Nasser's search of Mr. Johnston's pocket.   They were called to the Vickerman residence by a female alleging that another female was high on drugs and had assaulted the reporting female.   The reporting female was safe in the presence of a sheriff's deputy.   Mr. Johnston was not a female and, therefore, not the perpetrator of the assault.   Mr. Johnston was approximately fifty yards away from the Vickerman home.   Mr. Johnston was known to Trooper Mann to be a tow truck driver.   Trooper Mann had arrested Mr. Johnston on one prior

19

occasion for possession of marijuana.   Mr. Johnston was standing next to a
commercial vehicle with a flatbed trailer behind it on which a pick-up truck had
been loaded.   Mr. Johnston gave his correct name to the officers, stated that he
was present to tow the pick-up truck that was on the trailer, and stated that he
was doing so for a company named Classic Auto.   In response to Deputy
Nasser's question about who was down at the residence, Mr. Johnston replied
that he did not know.[5]   Finally, the officers knew that the Vickerman residence
had been the location of prior assaults and drug use.   None of these facts add up
to probable cause to arrest Mr. Johnston at the moment the <u>Terry</u> stop was
converted into an arrest.

   Also known to the officers prior to the search of Mr. Johnston's pocket was
the fact that they had asked him if he "had anything on him" to which
Mr. Johnston had replied "no."   Deputy Nasser had asked for consent to search
Mr. Johnston, and Mr. Johnston had not given any consent.

   The government characterizes Mr. Johnston as making a "furtive reach"
for his pocket upon Deputy Nasser asking him if he had anything on him.   The
court rejects this characterization.   After viewing the DVD, it is apparent that
Mr. Johnston was merely squaring his shoulders to more directly face Deputy

---

[5] Contrary to the government's assertion, Deputy Nasser did not ask whether Mr.
Johnston knew who owned the residence.   Nor did he ask who customarily lived
at the residence.   Deputy Nasser's question was as to who was actually present
at the residence right then and there.   Even if Mr. Johnston knew the answers to
the first two questions, he would not know the answer to the third question
unless he had personally visited the residence that day.   There was no evidence
presented to Deputy Nasser or Trooper Mann to indicate that Mr. Johnston had
visited the Vickerman residence on March 8, 2014.

Nasser.   This action is entirely natural and reasonable given the fact that
Deputy Nasser had just signaled to Mr. Johnston that this was no ordinary,
casual and friendly encounter but rather a focused and intent interrogation of
which Mr. Johnston was now the subject.   Anyone who makes such a
realization would naturally abandon a prior position of repose to straighten one's
spine and look one's accuser in the eye.   Mr. Johnston's right hand drifted off of
his truck fender and downward as he did this, but the court cannot discern that
his hand moved toward his pocket.   In any case, under Terry, if the officers did
believe Mr. Johnston was making a "furtive reach" for his pocket, the proper
course would have been to conduct a pat down search *outside of* Mr. Johnston's
clothing, not to reach inside his pocket and remove the cell phones.   Aquino,
674 F.3d at 923–26.

     Nor does the court accept the government's characterization of
Mr. Johnston assuming a "frisk me" posture immediately upon making contact
with Deputy Nasser.   Mr. Johnston's bodily position was not rigid with elbows
and knees locked and feet spread wide.   Rather, his body was in a position of
repose, leaning against his truck in rest, feet close together.   The fact that he
was in a position of repose rather than a position of submission is shown by the
fact that several times while speaking to Deputy Nasser he lifted one hand or the
other from the surface of his truck to casually gesture toward something while
speaking.   Again, assuming the government is correct in characterizing
Mr. Johnston's posture as unusual, the proper action for police to take at this

21

point would be a pat down search of the exterior of Mr. Johnston's clothing, not a search into the interior of his pockets.   No probable cause existed to arrest Mr. Johnston at the point Deputy Nasser reached into his pocket.

It is significant that Deputy Nasser never conducted a pat down search of Mr. Johnston prior to reaching into his pocket.   Furthermore, Deputy Nasser testified that he did not believe that the cell phones were weapons when he reached into Mr. Johnston's pocket and withdrew them.   Searching inside pockets on clothing is necessarily a more intrusive search than a pat down of the exterior of clothing and, thus, is not the " 'least intrusive means' necessary to protect an officer's safety" as is required by Terry.   Id. at 925 (quoting United States v. Correa, 641 F.3d 961, 967 (8th Cir. 2011)); United States v. Casado, 303 F.3d 440, 448–49 (2d Cir. 2002).   "An actual search of a person[] . . . is not authorized under Terry until *after* a pat down confirms the presence of a weapon or contraband."   Aquino, 674 F.3d at 925 (citing United States v. Tovar-Valdivia, 193 F.3d 1025, 1028 n.1 (8th Cir. 1999)).

In Aquino, the court held that the officer exceeded the scope of a Terry stop and converted the encounter into an arrest for which probable cause did not exist when the officer lifted the suspect's pant leg to search underneath it. Therefore, the Eighth Circuit affirmed the district court's suppression of the physical evidence found in the search.   Id. at 927.

Similarly, in United States v. Villa-Gonzalez, the court suppressed physical evidence as "fruit of the poisonous tree" after a suspect was seized

22

within the meaning of the Fourth Amendment without supporting probable cause or reasonable suspicion.   United States v. Villa-Gonzalez, 623 F.3d 526, 534–35 (8th Cir. 2010) (citing Wong Sun v. United States, 371 U.S. 471 (1963)). The defendant's statements taken after he was seized were suppressed as well as the physical evidence which was discovered derivatively from those statements, including the fruits of a search warrant based on the defendant's statements. Id.

When a defendant is the subject of an unconstitutional search or seizure, and then a statement is obtained voluntarily and with the proper advisement of Miranda rights and a waiver of those rights, the primary factor a court must consider in determining whether the subsequent statement is "fruit of the poisonous tree" is whether, despite the illegality, the statement was the product of a clear act of free will on the part of the defendant.   Wong Sun, 371 U.S. at 486.   The fact that a Miranda warning was given and a waiver obtained in between an illegal seizure and a legal statement does not alone purge the taint of the initial illegality.   Brown v. Illinois, 422 U.S. 590, 601–03 (1975).

Whether the subsequent statement was the product of a clear act of free will depends on whether a sufficient lapse in time has occurred between the illegality and the statement sufficient to have purged the primary taint of the illegality, whether there has been a change in place from the illegality to the place of the statement, whether there has been a change in identity of the interrogators, as well as the purpose and flagrancy of the government's

23

misconduct with regards to the initial illegality.   Oregon v. Elstad, 470 U.S. 298, 310 (1985); Taylor v. Alabama, 457 U.S. 687, 690 (1982); Brown, 422 U.S. at 603–04.

Here, as will be seen below, proper Miranda advisements were not given to Mr. Johnston and the circumstances were such that those advisements should have been given.   Furthermore, a lapse of only a few seconds—less than a minute—occurred between the constitutional violation of Deputy Nasser reaching into Mr. Johnston's pocket and Mr. Johnston's subsequent statement that he had methamphetamine in his pocket.   Nothing occurred sufficient to purge the taint of the initial constitutional violation.   Accordingly, the court recommends that Mr. Johnston's statements on March 8, 2014, as well as all physical evidence taken from his person on that day be suppressed as fruit of the poisonous tree.   Wong Sun, 371 U.S. at 486 (holding that the exclusionary rule of the Fourth Amendment applies equally to verbal and physical evidence); Aquino, 674 F.3d at 925–26.

**B.    Whether Miranda Warnings Were Required**

### 1.    The Law Pertaining to Miranda

Mr. Johnston also moved for suppression of his statements on March 8, 2014 on the basis of Miranda.   There may be several reasons for the court not to address separate arguments made as to the admissibility of Mr. Johnston's statements.   For one, the government advises that it does not intend to introduce Mr. Johnston's statements from March 8, 2014 at the trial in this

24

matter.   For another, the court has concluded that Deputy Nasser's Fourth Amendment violation requires suppression of the statement.   However, the parties briefed and argued this issue and evidence was presented regarding it. Therefore, the court addresses the argument in the event a reviewing court disagrees with this court's Fourth Amendment analysis.   Furthermore, if the court is wrong about its Fourth Amendment analysis, whether <u>Miranda</u> was violated may have a bearing on the admissibility of physical evidence seized on March 8.

The holding in <u>Miranda</u> "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."   <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).   <u>Miranda</u> warnings protect an individual's Fifth Amendment privilege against self-incrimination "by ensuring that a suspect knows that he may chose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."   <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).   A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present:   (1) the suspect is being interrogated <u>and</u> (2) the suspect is in custody.   <u>Unites States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.   See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).   It is clear that the officers' direct questions to Mr. Johnston ("what have you got on you?" and "what're you holding?") fit the definition of interrogation.   The real issue here is whether Mr. Johnston was in custody.

A suspect is considered to be "in custody" "either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way."   Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).   Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a " 'degree associated with formal arrest.' "   Berkemer, 468 U.S. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)); United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. "Two discrete inquiries are essential to the [in custody] determination:   first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."   Thompson v. Keohane, 516 U.S. 99, 112 (1995).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.   See United

26

States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997).   Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to demonstrate that the defendant voluntarily waived his Miranda rights only after the defendant has sustained this initial burden.   See United States v. Moore, 104 F.3d 377(D.C. Cir. 1997).   The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.   See, e.g., United States v. Morriss, No. 06-6010-01-CR-SJ-SOW, 2006 WL 3519344, *12 (W.D. Mo. 2006) (placing the initial burden on the defendant, while citing to extra-circuit cases for authority).   For purposes of this report and recommendation, the court places the burden on the government to demonstrate that Mr. Johnston was not in custody at the time of his interrogation.

In determining whether a suspect reasonably believed himself to be in custody, the court examines the totality of the circumstances.   Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).   The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.   Berkemer v. McCarty, 468 U.S. 420, 442 (1984); United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990); Carter, 884 F.2d at 370.

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:   (1) whether the suspect was informed that he

27

was free to leave and that answering the interrogator's questions was voluntary;
(2) whether the suspect possessed freedom of movement during the
interrogation; (3) whether the suspect initiated contact with the interrogator or
voluntarily acquiesced in the interrogation; (4) whether the interrogator
employed strong-arm tactics or strategies; (5) whether the atmosphere of the
interrogation was dominated by the police; and (6) whether the suspect was
arrested at the close of the interrogation.   See United States v. Flores-Sandoval,
474 F.3d 1142, 1146–47 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349).   The
first three factors are "mitigating factors which, if present, mitigate against the
existence of custody at the time of questioning."   United States v. Axsom, 289
F.3d 496, 500–01 (8th Cir. 2002).   The last three factors are "aggravating factors
which, if present, aggravate the existence of custody."   Id. at 501.   Reference to
these factors is helpful, but these factors are not exclusive and custody " 'cannot
be resolved merely b[y] counting up the number of factors on each side of the
balance and rendering a decision accordingly.' "   Flores-Sandoval, 474 F.3d at
1147 (quoting United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004)).   In
addition, the place where the interrogation took place, the purpose of the
interrogation, the length of the interrogation, and other relevant factors must
also be considered.   Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

Courts have given substantial weight to an interrogator advising a suspect
that no arrest is being made or will be made at the time of questioning, and that
the suspect is free to decline to answer questions or to terminate the

28

interrogation at any point the suspect chooses.   For example, in United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the court emphasized an express advisement that the suspect is not under arrest and that his participation is voluntary is " '[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody.' "   Czichray, 378 F.3d at 826 (citing Griffin, 922 F.2d at 1349).   However, the court also cautioned that the Griffin factors are by no means exhaustive and should not be applied "ritualistically." Id. at 827.   Nonetheless, the Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the issue of custody.   See, e.g., United States v. Plumman, 409 F.3d 919, 924 (8th Cir. 2005).

Finally, whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to leave.   Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citations omitted).

### 2.    Application of the Law to Mr. Johnston's Facts

Mr. Johnston was not under formal arrest until Deputy Nasser placed him in handcuffs.   Clearly, Miranda warnings should have been given to Mr. Johnston at this point.   Such warnings were not given.   Therefore, the statements Mr. Johnston made in response to Deputy Nasser's interrogation post-handcuffs must be suppressed.

29

However, Mr. Johnston's formal arrest is not determinative of the question of whether he was "in custody" for Miranda purposes prior to being placed in handcuffs.   United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006). Nearly all of the Griffin factors favor a finding that Mr. Johnston was "in custody" even prior to his formal arrest.   Griffin, 922 F.2d at 1349.   The officers did not tell him that he was free to leave or that answering his questions was voluntary. Mr. Johnston did not possess freedom of movement during the interrogation—here, a picture truly is worth "a thousand words" and viewing of Exhibit 1 is necessary.   The interrogators made contact with Mr. Johnston first, not vice versa.   The interrogators assumed strong-arm tactics by encroaching on Mr. Johnston's physical space on both sides and using an accusatory tone from the beginning—the officers' questions assumed that Mr. Johnston had drugs on his person.   The atmosphere was dominated by the police.   Finally, Mr. Johnston was, in fact, arrested at the conclusion of the interrogation.[6]

This case is similar to the facts of Martinez, discussed above in connection with the Terry stop issue.   To recap, in Martinez, shortly after a bank robbery, police spotted a man, Martinez, matching the description of the robber walking in a nearby park.   Martinez, 462 F.3d at 906.   The officer observed that the man was walking very fast, that his face was shiny as though sweaty, and when the man noticed the police officer looking at him, he quickly looked down again. Id.   The officer approached Martinez and asked to talk to him, whereupon

---

[6] These factors also support the court's earlier holding that Mr. Johnston was seized within the meaning of the Fourth Amendment.   See supra Part A.

Martinez—without being directed to do so—placed his hands behind his head. Id. The officer grabbed Martinez's hands and told him he was being detained because he matched the description of a bank robber. Id.

Here, the government characterizes Mr. Johnston as immediately assuming a position of submission when approached by the officers without the officers telling him to do so—a "frisk me" posture—by placing his hands on the fender/bumper of his truck. Viewing the DVD, the court disagrees with this characterization. However, in Martinez as here, the officers then detained the suspect, patted him down, and closely questioned him about his possession of drugs or guns. Id. The Martinez court concluded that no reasonable person under these circumstances would have felt free to leave and, thus, that Miranda warnings were required. Id. at 909–10. Since Miranda warnings had not been given to Martinez, the court held that his statements must be suppressed. Id. at 910.

The court in this case reaches the same conclusion. Mr. Johnston was clearly not free to leave from the inception of his encounter with the officers—Deputy Nasser immediately assumed control of Mr. Johnston's person by placing his left hand at the small of his back and crowding into his personal space. At the same time, Trooper Mann "flanked" Mr. Johnston and similarly encroached into Mr. Johnston's personal space on his other side. The positioning and close quarters of Deputy Nasser and Trooper Mann to Mr. Johnston immobilized him against the truck he had been leaning on and

31

effectively eliminated any means by which he could avoid the encounter with Deputy Nasser.   Next, Deputy Nasser, with his left hand still on Mr. Johnston's back, grabbed Mr. Johnston's right wrist when Mr. Johnston attempted to move it and placed it firmly back on the truck.   Both officers at this point admonished Mr. Johnston to keep his hands on the truck.   All these actions took place less than thirty seconds into the encounter and before Mr. Johnston made any incriminating statements.   No reasonable person would have reached a conclusion that they were free to leave under these circumstances.   Therefore, <u>Miranda</u> warnings were required at least as of the point in the encounter when Deputy Nasser grabbed Mr. Johnston's wrist.   Because <u>Miranda</u> warnings were not given at this juncture, Mr. Johnston's statements from this point forward must be suppressed.

**C.     Applicability of <u>Patane</u>**

The government disputes the assertion that the officers in this case violated Mr. Johnston's Fourth Amendment rights.   It characterizes the officers' mistake, if any, as a simple failure to advise of <u>Miranda</u> rights.   The government asserts that Mr. Johnston's unwarned statement was nevertheless a voluntary statement and urges the court to apply <u>United States v. Patane</u>, 542 U.S. 630 (2004), and hold that the <u>Miranda</u> violation does not merit suppression of the physical evidence in this case.

In <u>United States v. Patane</u>, the Court, in a plurality opinion, addressed whether physical evidence obtained as a result of a voluntary but unwarned

32

statement should be suppressed as fruit of the poisonous tree because the statement was obtained in violation of <u>Miranda</u>. <u>Id.</u> at 633–34. Justices Thomas, Scalia, and then-Chief Justice Rehnquist held that physical evidence does not fall within the Fifth Amendment's protection against self-incriminating statements and, therefore, physical evidence which is obtained pursuant to voluntary but unwarned statements need not be suppressed. <u>Id.</u> at 641–45. Justices Kennedy and O'Connor concurred, stating that admission of physical evidence does not "run the risk of admitting into trial an accused's coerced incriminating statements against himself." <u>Id.</u> at 645.

In <u>Martinez</u>, discussed at length above, the court held that seizure of the large wad of cash in Martinez' pocket was "fair game" despite his unwarned statement about possessing the money. <u>Martinez</u>, 462 F.3d at 910. That was because probable cause existed for Martinez's arrest—the bank teller's identification of Martinez—separate and apart from Martinez's statement. <u>Id.</u> Thus, the discovery of the cash did not depend upon the unwarned statement. <u>Id.</u> Under these facts, the court held that the discovery of the money in Martinez's pocket was not "fruit of the poisonous tree" of the <u>Miranda</u> violation. <u>Id.</u> The <u>Martinez</u> decision does not cite to or discuss <u>Patane</u> in ruling on the "fruit of the poisonous tree" argument. <u>Id.</u>

The <u>Martinez</u> holding is inapposite here. Without Mr. Johnston's unwarned statement, the officers would not have had probable cause to arrest him. So the discovery of the methamphetamine in this case, unlike the

discovery of the cash in <u>Martinez</u>, depends *completely* upon Mr. Johnston's unwarned statement.

In <u>United States v. Villa-Gonzalez</u>, there had been both a <u>Miranda</u> violation as well as a Fourth Amendment violation.   <u>See</u> <u>United States v. Villa-Gonzalez</u>, 623 F.3d 526, 531–34 (8th Cir. 2010).   Under those circumstances, the court refused to apply <u>Patane</u> to the defendant's motion to suppress physical evidence; instead the court applied <u>Wong Sung</u> to suppress.   <u>Id.</u> at 534–35.   Although the court noted that both <u>Villa-Gonzalez</u> and <u>Patane</u> involved a <u>Miranda</u> violation, there was a crucial difference.   <u>Id.</u> at 535.   In <u>Patane</u>, the defendant had already been lawfully arrested at the time his <u>Miranda</u> rights were violated, while under the facts of <u>Villa-Gonzalez</u>, the defendant's unwarned statements themselves were fruits of an illegal seizure under the Fourth Amendment.   <u>Id.</u> Under these circumstances, the court held, the analysis of <u>Wong Sun</u> and not <u>Patane</u> applies.   <u>Id.</u>

This case is identical to <u>Villa-Gonzalez</u> and distinguishable from <u>Patane</u> in exactly the same way.   Here, Mr. Johnston's statements occurred *after* he was illegally seized and were themselves fruits of the Fourth Amendment violation. The <u>Miranda</u> violation, too, occurred *after* the Fourth Amendment violation.   To apply <u>Patane</u> to these facts, as the <u>Villa-Gonzalez</u> court noted, "would swallow up the entirety of the fruit of the poisonous tree doctrine."   <u>Id.</u> at 535.   Thus, even if Mr. Johnston's statement was voluntary, as the government asserts, it is immaterial to the court's Fourth Amendment analysis under <u>Villa-Gonzalez</u> and

Wong Sun.   Mr. Johnston's statement, which supplied the only basis for his arrest, was the product of an unlawful seizure and any physical evidence resulting therefrom must be suppressed.   Accordingly, the court concludes that Patane is inapplicable to the facts of this case.

## D.    Search Incident to Arrest

As a final salvo, the government attempts to salvage the physical evidence seized by the officers in this case by asserting the search incident to arrest exception to the warrant requirement.   The effort is unavailing.

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. CONST. amend. IV. "Generally, to search a private place, person, or effect, law enforcement must obtain a warrant supported by probable cause from a judicial officer."   United States v. Sanders, 341 F.3d 809, 818 (8th Cir. 2003) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).   The same proposition holds true for the seizure of property—"[g]enerally, police officers must have a warrant before they can seize a person's property."   United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355, 1358 (8th Cir. 1993) (citing United States v. Place, 462 U.S. 696, 701 (1983)).   A search or seizure conducted by the government without a warrant is presumptively unreasonable.   United States v. Kimhong Thi Le, 474 F.3d 511, 514 (8th Cir. 2007); United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004).   "The touchstone of the Fourth Amendment's promise is

'reasonableness,' which generally—though not always—translates into a warrant requirement." United States v. Hatten, 68 F.3d 257, 260 (8th Cir. 1995) (citing Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)).

Because "the overriding principle of the Fourth Amendment is one of reasonableness," the courts have created "logical and flexible" exceptions to the warrant requirement.   United States v. Martin, 806 F.2d 204, 206 (8th Cir. 1986).   "A warrantless search of a private place can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant." United States v. Heisman, 503 F.2d 1284, 1287 (8th Cir. 1974) (citing Jones v. United States, 357 U.S. 493, 499 (1958)).   "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception."   United States v. Reidesel, 987 F.2d 1383, 1388 (8th Cir. 1993) (citing Mincey v. Arizona, 437 U.S. 385, 391 (1978)).   One such exception to the warrant requirement is the search incident to arrest, asserted by the government here.

" '[A] lawful custodial arrest establishes authority to conduct a full search of the arrestee's person, and . . . such a search is "not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment." ' "   United States v. Ball, 499 F.3d 890, 896 (8th Cir. 2007) (quoting United States v. Hrasky, 453 F.3d 1099, 1101 (8th Cir.

36

2006) (quoting <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973)), <u>vacated by</u> <u>Ball v. United States</u>, 556 U.S. 1205 (2009) (vacating on other grounds).   The exception for searches incident to arrests is founded on the policy of ensuring officer safety and evidence preservation.   <u>See</u> <u>Arizona v. Gant</u>, 556 U.S. 332, 338 (2009) (citing <u>United States v. Robinson</u>, 414 U.S. 218, 230–34 (1973); <u>Chimel v.</u> <u>California</u>, 395 U.S. 752, 763 (1969), <u>abrogation recognized by</u> <u>Davis v. United</u> <u>States</u>, 131 S. Ct. 2419 (2011) (holding that when police conduct an objectively reasonable search in reliance on binding appellate precedent, the exclusionary rule does not apply)).   Thus, a search incident to an arrest can include only "the arrestee's person and the area 'within his immediate control.' "   <u>Id.</u> at 339 (quoting <u>Chimel</u>, 395 U.S. at 763).   This means the area that the arrestee can reach in order to gain possession of destructible evidence or a weapon.   <u>Id.</u> This area-of-reach restriction ensures that the exception for searches incident to arrest is commensurate with the purposes of the exception.   <u>Id.</u>   If the search extends into areas that the arrestee cannot reach, the exception for a warrantless search incident to arrest does not apply.   <u>Id.</u>

Here, the court has already concluded that a Fourth Amendment violation occurred when Deputy Nasser reached into Mr. Johnston's pocket to remove his cell phones.   It was at this point that the <u>Terry</u> stop was converted into an arrest.   As was already discussed, there was no probable cause for Mr. Johnston's arrest at this point.   Mr. Johnston's subsequent formal arrest—the placing of handcuffs on him—was based on his statements to the

37

officers immediately after his Fourth Amendment rights were violated.
Mr. Johnston's statements formed the only basis for his arrest.   The court has
already concluded that those statements must be suppressed as fruit of the
poisonous tree.   Without the statements, Deputy Nasser had no reason to arrest
Mr. Johnston.   Since there was no lawful basis for the arrest, the search
incident to arrest doctrine is not applicable to these facts.

## CONCLUSION

The court respectfully recommends that the motion to suppress evidence
[Docket No. 18] filed by defendant Arnold Barton Johnston be granted in its
entirety.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and
recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B),
unless an extension of time for good cause is obtained.   See FED. R. CRIM. P.
59(b); 28 U.S.C. § 636(b)(1)(B).   Failure to file timely objections will result in the
waiver of the right to appeal questions of fact.   Id.   Objections must be timely
and specific in order to require *de novo* review by the district court.   See

<u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990) (per curiam); <u>Nash v. Black</u>, 781

F.2d 665 (8th Cir. 1986).

Dated May 29, 2014.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE