UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 14-50028-JLV |
| | ) | |
| Plaintiff, | ) | ORDER ADOPTING REPORT |
| | ) | AND RECOMMENDATION |
| vs. | ) | AND GRANTING MOTION |
| | ) | TO SUPPRESS |
| ARNOLD BARTON JOHNSTON, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

Defendant Arnold Johnston filed a motion to suppress all items seized from him and statements made by him to law enforcement during an encounter with law enforcement on March 8, 2014. (Docket 18). The suppression motion was referred to Magistrate Judge Veronica Duffy for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order dated June 11, 2007. A suppression hearing was held before the magistrate judge on May 20, 2014. (Docket 36). Magistrate Judge Duffy issued an amended report and recommendation on May 29, 2014. (Docket 39). The government timely filed objections to the amended report and recommendation on June 12, 2014. (Docket 41).

The court finds the magistrate judge's amended report and recommendation is an appropriate application of the law to the facts presented by the parties at the suppression hearing. See United States v.

Newton, 259 F.3d 964, 966 (8th Cir. 2001).  For the reasons stated below, the government's objections are overruled and the amended report and recommendation of the magistrate judge is adopted in its entirety.

## THE GOVERNMENT'S OBJECTIONS

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Id.  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  Id.

### A.   MAGISTRATE JUDGE'S FINDINGS OF FACT

The government's objection to the magistrate judge's findings of fact in the amended report and recommendation focuses on one issue.  "[T]he finding that [Mr. Johnston] was engaged in non-suspicious behavior is not supported by the video evidence."  (Docket 41 at p. 7).

## FACTUAL DETERMINATIONS

Deputy Nasser believed Mr. Johnston was acting in a suspicious manner from the moment their encounter began.  Deputy Nasser testified that as he approached Mr. Johnston, he assumed the position of a person braced against his vehicle and waiting to be frisked.

2

> Q. Where did he have his hands?
>
> A. Both his hands were on the bed of the pickup.
>
> Q. Did you tell him to do that at that point?
>
> A. No, sir.
>
> . . .
>
> Q. Did you in any way indicate he should assume that position?
>
> A. Not at all.
>
> Q. Have you ever had anybody do that before without you telling them?
>
> A. No. To place the hands on the pickup in that prone position, no.

(Docket 36 at p. 10:3-16).

Having reviewed suppression hearing exhibit 1—the video recording[1] of the encounter between Mr. Johnston and law enforcement on March 8, 2014—the court concludes that the amended report and recommendation accurately states the facts. The DVD discloses that as Deputy Nasser approached Mr. Johnston, he paused from his work between the pickup and trailer and was leaning casually with his arms outstretched across the top rail of the box of the pickup. Exhibit 1 at 4:26-30. This pose naturally caused Mr. Johnston's back to be away from the box of the pickup, but Mr.

---

[1] The video recording was created by a "point-of-view camera" which Deputy Nasser wore on his head. (Docket 36 at p. 6:20-21).

Johnston turned his head in a casual manner and gestured with his right arm to visit with Deputy Nasser. Id. at 4:33-38. This pose is neither out of the ordinary in western South Dakota, nor is it suspicious conduct. There was nothing suspicious about Mr. Johnston's conduct up to this point in time.

The government also asserts Mr. Johnston was acting suspiciously because "he has no idea who lives or is present at the site . . . [and] appears hesitant and nervous when asked who he is picking up a car for." (Docket 41 at p. 9). Deputy Nasser claims it was unusual that Mr. Johnston "was swallowing hard . . . [and] his hands were shaking . . . ." (Docket 36 at p. 14:5-8). Deputy Nasser found it hard to believe that Mr. Johnston would not know who was present at a mobile home some fifty yards away. Id. at pp. 25:13-15; 27:12-14. Yet Deputy Nasser admits he did not ask Mr. Johnston who owned the property. Id. at p. 24:20-25. Deputy Nasser admitted it made sense that Mr. Johnston, with a business vehicle, would be at that location moving a vehicle. Id. at p. 25:10-12. South Dakota Highway Trooper Derek Mann found nothing out of the ordinary in Mr. Johnston being at that location retrieving a vehicle. Id. at p. 35:15-18.

The DVD does not show Mr. Johnston swallowing hard, acting nervously or shaking during his encounter with Deputy Nasser and Trooper Mann. When asked for whom he was picking the car up, Mr. Johnston

4

gestured casually with his right arm and said "Classic Auto." Exhibit 1 at 4:41-45.

Finally, the government claims the DVD supports Deputy Nasser's testimony that when asked if he had "anything on him," Mr. Johnston "moved his right hand from the pickup box." (Docket 41 at p. 9). "The United States maintains that it was reasonably [sic] for the Deputy to think he was moving his hand toward his pocket." Id.

The DVD shows Mr. Johnston gesturing with his right hand while identifying his employer as "Classic Auto," but the move was up and away from the box of the pickup and then drifting back toward its original casual position. Exhibit 1 at 4:45-47. At the same moment Deputy Nasser asked "do you have anything on you? Do you mind if I check real quick?" he grabbed Mr. Johnston's right forearm and forcibly returned it to the top of the box of the pickup while demanding Mr. Johnston "keep your hands up there." Id. at 4:47-49. Deputy Nasser maintained his grip on Mr. Johnston's right forearm during the course of several questions. Id. at 4:49-5:04.

Mr. Johnston gave appropriate answers to Deputy Nasser's questions and was not acting in a nervous manner. The court finds Mr. Johnston's conduct was non-suspicious. The government's factual objection is

overruled. The magistrate judge's findings of fact are adopted by the court in accordance with 28 U.S.C. § 636(b)(1)(C).

## B. MAGISTRATE JUDGE'S CONCLUSIONS OF LAW

The government objects to the magistrate judge's conclusion of law that Mr. Johnston was under arrest prior to the officers' questioning of him. (Docket 41 at pp. 7-10).

### DECISION

The magistrate judge found the officers were justified in performing a Terry[2] stop. (Docket 39 at p. 17). "The court concludes that the officers were justified in contacting Mr. Johnston to conduct a Terry stop if, for no other reason, than to ensure that he did not have a weapon or pose a danger to the officers as they approached the Vickerman residence with their backs turned to Mr. Johnston." Id.

The crux of the government's legal objection is that the magistrate judge erred in concluding "when Deputy Nasser reached into the defendant's [pocket] to retrieve cell phones he thought were falling out the encounter was transformed from a *Terry* stop to an arrest requiring *Miranda*[3] warnings." (Docket 41 at p. 7). "The United States maintains that asking the defendant to keep his hands where he had freely placed them

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

[3] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

6

and removing two cell phones that appeared to be in danger of falling from his pocket did not convert this encounter into an arrest requiring the administration of Miranda warnings prior to asking if he had anything on him." Id. at p. 9.

The DVD disclosed the following conduct of the two law enforcement officers. As soon as Trooper Mann[4] arrived on the scene, he assumed a position to Mr. Johnston's immediate left and was leaning in toward Mr. Johnston while Deputy Nasser[5] was up close against Mr. Johnston's back and behind Mr. Johnston's right shoulder. While maintaining a grip on Mr. Johnston's right forearm and wrist area, Deputy Nasser asked "do you have anything on you? . . . tell me right now if you do, it will be easier . . . what do you have on you?" while Trooper Mann interjected at the same time "be honest about it, you and I know each other." Exhibit 1 at 4:49-5:04. The officers stepped back slightly and Trooper Mann again asked "what are you holding?" while Deputy Nasser released Mr. Johnston's arm but remained immediately behind Mr. Johnston. Id. at 5:04-17. It was at that moment that Mr. Johnston stated "probably some meth." Id. at 5:17-20.

---

[4]Trooper Mann is known to the court. He is approximately 5'8" tall and weighs between 220-30 pounds. As evidenced by the DVD, Trooper Mann is very muscular and casts a commanding presence.

[5]Deputy Nasser appears in the DVD to be several inches taller than Mr. Johnston and broader in stature.

At no time before this physical activity began did either officer conduct a Terry pat down for weapons. "The sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. The officers would have been allowed to pat down Mr. Johnston's outer clothing searching for weapons. See id. at 29-30. This was never done. The officers were not concerned about their own safety or the possibility Mr. Johnston may have been concealing a weapon. Rather, by their physical presence and Officer Nasser's physical restraint of Mr. Johnston, the officers turned a Terry stop into an arrest. "[W]here an officer exceeds the permissible scope of Terry, the investigatory detention is transformed into an arrest." United States v. Aquino, 674 F.3d 918, 924 (8th Cir. 2012). "[A] Terry stop that becomes an arrest must be supported by probable cause." Id. (internal citation omitted). At the point of arrest of Mr. Johnston, the officers did not have probable cause to effectuate an arrest.

The government maintains the officers' conduct in restricting Mr. Johnston's movements was "a far cry from handcuffing him or other more restrictive actions that have been found to be permissible during investigative stops under certain circumstances." (Docket 41 at p. 10).

8

"The protections of Miranda apply to custodial interrogations." United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007). "A custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way.' " Id. (quoting Maine v. Thibodeau, 475 U.S. 1144, 1146 (1986), quoting Miranda, 384 U.S. at 444). In determining whether Mr. Johnston was in custody or otherwise significantly deprived of his freedom, the court looks at the totality of the circumstances from the objective point of view of a reasonable person. Id. at 1145. In determining the totality of the circumstances, the court must consider the following factors: "(1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning." Id. at 1146-47.

The court finds Mr. Johnston was never informed he was free to leave, his personal space was invaded, and his freedom of movement was restricted both by the physical presence of the two officers and by Deputy Nasser's strong arm tactic of holding Mr. Johnston's right arm against the

9

box of the pickup. The court finds the atmosphere was further dominated by Deputy Nasser's demanding and commanding questioning of Mr. Johnston, while restraining the defendant's arm and restricting his freedom of movement. Finally, the court finds Mr. Johnston was arrested moments after the interrogation was completed, without the benefit of Miranda.

The court concludes Mr. Johnston was illegally arrested, or at least his "freedom of movement restricted to the degree associated with formal arrest." See id. at 1146. The court concludes the physical evidence and Mr. Johnston's statements were obtained as a result of an unlawful arrest in violation of the Fourth Amendment and are inadmissible fruits of the poisonous tree under Wong Sun v. United States, 371 U.S. 471 (1963). Both the unlawful arrest and the absence of Miranda warnings compel the court to overrule the government's objection.

The magistrate judge's conclusions of law and recommendation are adopted by the court in accordance with 28 U.S.C. § 636(b)(1)(C).

## ORDER

After conducting a *de novo* review of the entire record, it is hereby

ORDERED that the government's objections (Docket 41) are overruled.

IT IS FURTHER ORDERED that the amended report and recommendation of Magistrate Judge Duffy (Docket 39) is adopted by the court.

IT IS FURTHER ORDERED that the defendant's motion to suppress (Docket 18) is granted.

IT IS FURTHER ORDERED that all physical evidence seized and all statements made by Mr. Johnston on March 8, 2014, are suppressed.

Dated July 21, 2014.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE